May it please the Court, my name is Demetrius K. Orris and I am here on behalf of the Maryland Financial Bank May it please the Court, my name is Demetrius K. Orris and I am here on behalf of the Maryland Financial Bank who is the appellant in the above-captioned case here before you today. I think it's always important for me at least to try to frame the issues that I see here today and why we're here. I think the first, and I think the issues are relatively straightforward and I think this case is relatively straightforward. First, I think the Court needs to address one is paragraph nine of the participation agreement between the two parties to this case. They're not ambiguous. I think the second issue is if it is ambiguous, did the lower court potentially err by not granting summary judgment in favor of Maryland Financial Bank in light of the only evidence in the record being documents that supported Maryland Financial Bank's interpretation. And thirdly, if it's unambiguous and the trial court correctly interpreted the Did the lower court err by failing to consider or address at all, in my view, whether the participation agreement was amended by the letter that is in the record dated October 26, 2011? Well, if the contract is not ambiguous, why would you consider that? Because if a contract can always be amended whether it's to construe the original contract? In other words, did that letter itself constitute an amendment of the contract initially? Well, let's just get right to that. Sure, Your Honor. It's a unilateral letter, not signed by the other party. Correct. Your contract says amendments must be signed by both parties. And that wasn't done. And there's a case law, Your Honor, that says, in Maryland at least, that says a contract can be amended by any means even if it requires an amendment be executed in writing. And this letter was, as set forth in the record in the affidavit, was at our request that they confirm this interpretation of paragraph 9 of the participation agreement and Bank of Eastern Shore replied to us in a signed document. But if it's confirming what the original agreement means, that's not an amendment. Well, it's either one, Your Honor. I mean, my view is it's either one or the other. If the original agreement is clear, you wouldn't get to Mr. Robbins' letter, would you? If the agreement is clear in my favor, you're correct. There's no need to get to Robbins' letter. What if it's clear in their favor? If it's clear in their favor, that's my whole point. If it's clear in their favor, then you have to get to the contract. Unambiguous contracts can be amended by the parties. But it says this letter is to affirm. Correct. It doesn't say we're amending, does it? That's right. But I mean, if the parties did not intend initially, because of the trial court's interpretation, a first-out basis to my client and the Maryland Financial Bank, then by now between the parties. Why else write that letter? Well, if we give the money to the Maryland Bank that it requests in this case, how has it shared rateably in the loss on this letter? Isn't it supposed to do that under the contract? Yes, Your Honor, and I think we laid that out for you in our brief. If you look at our brief, and I can direct you to that. Maybe you can just say it to us. Yeah, at page 23 and 24, we went through this analysis for Your Honors to figure out how the allocation of the loss would take place. If we got paid back our participation interest first, as we're required to do under paragraph 9 of the contract, then we no longer have an interest in the loan as a consequence of that payment. So we have a zero interest, and any loss would be borne, and they would get to take on their books or whatever it is in records the entire loss associated with this loan. And I also laid out in our brief at page 23 what happens because there's always the possibility that the collateral would not have sold for even close to the amount of the debt. I've done a lot of foreclosures as a result of financial crisis, and it's not unusual that property sells for 30 to 40 percent of the loan value. And if that were to happen, and they did get the proceeds of the foreclosure sale, there's still a way whereby the Maryland Financial Bank would be able to take some of that loss, even though it would be a reduced loss because their participation interest would have been reduced as a consequence of them getting paid the money from the foreclosure sale proceeds. Well, these two charts of yours. Yes, sir. One of them says that Maryland gets a zero percent loss, and the other one says that Maryland gets a 14 percent loss. Yes, sir. And the contract says that the loss has to be shared pro rata, and the pro rata is the 25 percent, isn't it? Well, pro rata is pro rata based upon the party's participation interest in the loan. Well, okay. Yeah, that's 25 percent, right? Well, it gets reduced when our client gets paid their portion of the loan back. So our client no longer has a 25 percent interest that has a 14 percent interest in that case, or if they're paid back everything, they got a zero percent interest. That's because they're getting money. Well, if we go look at the participation agreement. Sure, Your Honor. And there are several times in the participation agreement where you make parties. Did you negotiate this agreement? Did not. I thought maybe you didn't. You've certainly seen, if you've seen a lot of these, you've seen a lot more than I have. But so on page two, there is a choice you can make whether you want first out, last out, pro rata out, 100 percent, and the choice is pro rata out, right? Correct. Okay. And then on page four, we have first in, last in, pro rata in, 100 percent, single disbursement of total. Again, we don't have the first in, last in, I guess, right? It's not checked on those two paragraphs. Right. And then on page, on JA 15, we once again have the choice of pro rata, right? And then what you're doing is telling me that 9B, that talks about first, just all by itself, not first in, is controlling. Even though every other time when your client had a choice, it was making it the distribution pro rata. And we don't have a little chart on 9B. We just have the language first. Right. And I can explain that, Your Honor. Go ahead. Or at least I'm going to try to explain it. Okay. Hopefully to your satisfaction and the rest of the judges' satisfaction. Okay. When we look at paragraph seven, it is clear that that section only talks about payments, and it says, payments collected and paid to OB, the originating bank, by the borrower. So this is your argument that this is a foreclosure, so it's different there? Exactly, Your Honor. That's precisely why. Why would anybody do that? Yeah, I mean, I understand it teels about different things, but all along they've made the choice that it's going to be pro rata. They make it in order to reduce the risk. My client did that in order to reduce its risk associated with this loan in the event of foreclosure. Because they might be concerned about the collateral, or they might be concerned about other things. So that's why that language of first was put in there, to ensure that my client got its money first in the event of foreclosure, because they recognized a potential risk in the event of a foreclosure. Both of you parties obviously know what the term first out means, and if you had intended foreclosure proceeds to be distributed on a first out basis, then you would have used that language in section nine, wouldn't you? I think more clear language could have been used in section nine to make that clear, Your Honor. It's easy for us to understand what the word first means. It's coming before all others in time. That's not an ambiguous term. Well, I agree with that. I don't think it's in time. I think whenever you pay somebody first means I take my money off the top, they get their portion, whatever's left over is somebody else's. That's still a temporal thing. Nevertheless, it's just the word first, not first out. I agree, that's the language in paragraph 9B that's in there. And to get to your position, we would have to say that first means first out. In my view, that is the interpretation. In other words, I don't think you need to reach that, because I think it says participation enters first. It's good enough to at least become a reasonable interpretation of this agreement and the distribution in the event of foreclosure. Okay, look at paragraph 8. I'm sorry, did you have another question? No, go ahead. I'm just ruminating here, which talks about losses and expenses. Yes, Your Honor. Well, if you share losses pro rata, right? Pro rata in accordance with the participation agreement of MFB and the other parties, whatever that might be, and that's a changing target depending if they get paid money at a foreclosure sale. But does it say that? Well, but I think it's a natural... In other words, why would there be an 8 if your determination about, if your reading of 9 is correct? There wouldn't be sharing losses, right? Well, for instance, they could have let their collateral go. There could be other reasons why there's not collateral there, and there needs to be some sharing of the losses. And in my example, I have the example where the collateral sells for less than an amount that's in place to fully satisfy Maryland Financial Bank that it does share in some of the losses based upon a reduction based upon what they receive as a result of the foreclosure sale. It's complicated, I understand that. But here's my view. We'll do our best. I think it's, despite the fact it's a simple agreement, I think a testament is it took the judge a long time to write this opinion. As I was reading, I felt like she was vacillating back and forth as to how she was going to come out on it. And so I don't, while it's clear all parties could have used better language, there's no doubt about it. Or the parties could have used better language in this agreement. But you made a good point, Your Honor. There are other areas where you do use pro rata. Why not stick it in paragraph 9b? If the parties intended a pro rata distribution, all they had to do was take first out and say it's percentage interest pro rata as hereafter. Right, that's a good argument. But it's also a good argument since we know, as my colleague just pointed out, that your client knows how to say first out. Why didn't they say first out? Just like why didn't they say pro rata? I mean, I think it's at a minimum, my view, at least, ambiguous here as to the intention of the parties. And when you look at the extrinsic evidence, it's clear that it says what it was supposed to be a first out basis when you look at Bank of Eastern Shore President's letter to my client. Three years after the fact, right? Three years after the fact. I think roughly. You're asserting that that's telling us what the intent was when the contract was executed. Or at least their understanding of it at the time, Your Honor. And certainly that extrinsic evidence, assuming it's ambiguous, which I believe this Court could obviously find that it's ambiguous because I think there are potentially two reasonable interpretations. I think mine is more reasonable. But assuming, for the sake of argument, you find that they're both reasonable interpretations, then the extrinsic evidence supports my view of this contract and what was intended by paragraph 9B. And it's not unreasonable in the commercial context because my client did that in order to protect its risk in the event of foreclosure. That's not unusual. That should be something a lot of parties end up doing or want to do in connection with any type of mutual agreement between the parties. So, Your Honor, here's what I'd like for you to do. One, I believe the contract is unambiguous and that first needs to mean something and ask that you rule in my favor, reverse on that basis and grant my motion for summary judgment. Assuming you don't want to do that. What does percentage interest mean to you used in the contract? The percentage interest means what interest does the bank, in this case Merrill Financial Bank, own in that particular loan? And that could be fluctuating because if they got some money from the foreclosure proceed, their percentage interest decreases. And that's another issue, Your Honor, you raised. That's another issue that, in my view, weighs towards ambiguity. That's a term that no one has ever defined in this agreement. Well, 25% is 25%, isn't it? Well, no, but the term percentage interest is never defined in this agreement. That's used in paragraph 9B. When you look at the agreement, there's nothing that talks about percentage interest. Maybe that'll... No, but that's because it's defined as a percentage. I mean, they probably don't define what with means either. We all know what... It's like define first, though, Your Honor. I mean, that's the same issue. I think first means I get my money first out of the proceeds of the contract for the sale. It has to mean something. And I think at a minimum, my client's interpretation of this agreement is at a minimum reasonable. And for that reason, it requires a remand. Well, why haven't you demanded that you be paid on the same basis from the payments that the guarantors have made? Haven't the guarantors made some payments in this case and haven't they been divided 25% to you and 75% to the Bank of Commerce? Well, that's because, again, those payments are not foreclosure payments. And if we get paid back everything from the foreclosure sale, we're not going to be entitled to any more guarantor payments, Your Honor. Okay. I see I'm out of time. I'll be glad to see any other issues in my rebuttal time. Thank you this morning. Thank you. Thank you. Good morning, Your Honors. Good morning. I'm Margaret McKee. I'm here on behalf of Bank of Commerce and sitting with me at council table is my law partner, Donald Proctor. Mr. Keene, I think the big question for you is what does first mean? What legal significance does that have? Your Honor, in the context as it appears in this Section 9, given the choices that were made previously on the checked boxes, it can only mean that before Commerce posts the proceeds, it's 75% of the proceeds to its books, it has to pay the 25% of the proceeds to MFB. Had other provisions... Doesn't your client get the money first? Pardon? Well, my client receives the money, yes. Mine receives the money. But it can't post it to its books. In other words, it goes into an account and the first person paid out... What legal significance does that have? Pardon? That doesn't have any legal... What's the purpose of putting it in there? Your Honor, I agree that given the checked boxes under Section 1, given the checked box under Section 7, where everything is pro rata, first becomes somewhat unnecessary in Paragraph 9. This is a form of agreement that I think the Court can take notice of that since there are options that could have been selected by the parties, but which were not selected by the parties. So you think if the other things said first out, the first there, it wouldn't have had to have first out in it? No. Is that what you're saying to us? What I'm saying is that if other options had been selected, so for example, if it had said first out, if first out had been a choice that had been selected under payments, then first makes more sense because you have to make sure and pay them first on their first out basis. But that is what you're saying. In other words, if first out had been checked in the two tables, then first here would have meant first out. It would. But we were gaining some, I don't know, some conclusion that since it didn't say first out, it didn't mean first out. And it doesn't mean first out because first... But you just basically conceded that if the other provisions of the contract said first out, this first would equal first out. If those other sections had been elected, then it would equal it. But they were not selected. So first becomes somewhat superfluous under the circumstances. Well, doesn't this argument about posting and everything, which candidly doesn't make any real difference, I don't think, doesn't that tell us that the contract's ambiguous as to the meaning of first? And then can we look at the parole evidence of the letter from the president of the bank? Your Honor, if you look at the precise language of 9B, it provides that if foreclosure upon the collateral is the action taken, OB shall promptly remit to MFB its percentage interest first of all net proceeds received by OB. It doesn't say that it is to remit the remaining interest in the loan to MFB. It says of all net proceeds received. So it can't be first out because under a first out analysis, it would have to then be returned all of its proceeds in all of its remaining interest in the loan. But that's not what 9B requires to be paid. Well, let's just assume for a second that 9B is ambiguous so we're allowed to look at parole evidence. Okay. Then doesn't the letter from the president of the Bank of the Eastern Shore kind of poke a hole in your case? If the court can somehow read 9B to mean that MFB gets paid its percentage interest in the remainder of the loan as opposed to in the foreclosure proceeds, then yes, I would agree that you could then consider the letter. However, since the language clearly directs that it's only the proceeds of the foreclosure that it gets its percentage interest from, I don't think that you could construe 9B as being ambiguous and therefore you would not be looking at Mr. Robbins' letter for that purpose. Before you answer the question about the letter, you were talking about the language of 9B. Can you say that for me again while I'm looking at 9B? Yes, certainly. 9B directs that if foreclosure is the action taken that OB shall promptly remit to MFB its percentage interest and if I can divert for one second, percentage interest is defined. It's defined under Section 1 and it says MFB's interest in the loan expressed as a percentage is 25%. So that's what percentage interest means. So MFB gets its percentage interest first, but of what? It gets its percentage interest first of all net proceeds received by OB as a consequence of such foreclosure. The problem with the analysis that's advanced by MFB is that it's saying instead of it getting its percentage interest, it's getting its remaining interest and instead of getting that interest of all net proceeds received, it's getting its remainder interest from the net proceeds received. From does not appear in the language of 9B and neither does remaining interest in the loan appear in 9B. 9B clearly provides that the percentage interest, the 25% of all net proceeds will be paid to MFB. If there's any confusion at all, if you look at the remainder portions of 9B where if OB acquires an interest in the collateral through foreclosure, deed in lieu of foreclosure or otherwise, OB and MFB shall have an undivided beneficial interest in the collateral equal to their respective percentage interest. In other words, if the collateral is obtained, Bank of Commerce owns 75% interest in the collateral and MFB owns 25%. Finally, the last section of 9B provides all expenses incurred in connection with any action taken pursuant to the provisions of this Section 9 shall be shared by OB and MFB in accordance with their respective interest in the loan. In other words, OB pays 75% of the expenses and MFB pays 25%. Now, you obviously have a very good grasp of this provision. So, apply it to actually what happened here. So, in the foreclosure, $1.3 million was received through the foreclosure. And what's the shortage? I'm sorry. In rough number. It's $900,000 short on a loan. So, $1.3 million was received. Approximately  was paid out to MFB through the agreement we made while the suit was pending. That represented a 25% payment. That was done pursuant to 9B's first sentence. Is that what you're saying? It was done pursuant to the first sentence in 9B? Yes. That's how Commerce distributed it pursuant to the distribution agreement. Okay. And Commerce retained the remaining 75% of the proceeds from foreclosure. There is an amount that is being escrowed presently the disputed amount of approximately $225,000. Okay. So, if we go to the second sentence about acquiring an interest in the collateral. Did that happen? No, it did not. The property was sold at foreclosure. That never was in play? No, but it does indicate again it reinforces the fact that what is intended is that in the event of a default whether it's acquiring the property through Deed and Lew or whether the property is purchased at foreclosure or whether in fact it's sold to a third party at foreclosure, the intent of 9B, which I think is clearly stated is that the division of whatever is received will be pro rata based upon the percentage interest. I understand your point. I just want to be clear. As I say, you have a better grasp. All of you have a better grasp of the facts. In the last sentence, were there any expenses? I'm sure there were, Your Honor. The HUD statement is in the joint record extract at some portion which I have not tabbed. But there's been no dispute about who pays them? No. And did you pay them under the 75-25% formula? Yes, we did. And this point was raised previously. That's also how the payments were made that were received from the district court suit on the guarantor's action. Well, the HUD statement doesn't say how the expenses are allocated. It just shows that there are expenses. Oh, on the HUD one? I'm sorry. To the extent there would have been expenses? There were expenses. Oh, it says allocated. I understand. I don't think there's a dispute in terms of how those were allocated. They would have been allocated pursuant to this section. And therefore, on a prorated basis, 75% to Commerce, 25% to MFB. But there's nothing in the record to demonstrate that, for Your Honor. Assuming we don't buy any of this and we think this is ambiguous, then talk to me about this letter. The Heinz letter, which is found at, I'm sorry, the Robbins letter, which is found at JA-128 provides that this letter is to affirm the Bank of Eastern Shore has agreed to remit all proceeds on a first-out basis to MFB if the above loan collateral is obtained as a consequence of a foreclosure proceeding by BOES. This condition is contained in the participation agreement dated August 17th, section 9B, default by borrower. This letter refers to a different loan. The loan number referenced here, 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, is a $150,000 loan, which was purchased by Bank of Commerce at the same time it purchased the $3 million loan. And that is evident in the record at JA-104 where the loan numbers and the loan amounts are set forth. But this says that it's the participation agreement to which this refers is the one dated August 17th, which is not the $150,000 one, it's the other one. I agree, Your Honor. This letter is itself ambiguous and does not resolve any of the ambiguities that the court might find exist in 9B. Moreover, there's no evidence in this record that there was ever a foreclosure on loan number 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, which is the loan referenced on the Bank of Eastern Shore. And the other side says this is just a typographical error. I don't know that, Your Honor. There's nothing in the record. No, I understand that, but that's what their submission is, that this is a typographical error. Your Honors, there was one issue that I had promised the clerk I would raise at the beginning of my argument, which is that we had removed from our brief the consideration argument as to the amendment. And the reason we did that is in the consideration argument we made a statement at the end of it, which was factually inaccurate. We said that there was nothing in 2011 which would have required MFB's consent. And that is not true, because the forbearance agreement in fact did change the terms of the loan. When I was writing the brief, I was more focused on the assertion that the $150,000 loan was extended MFB asserted that it was extended in 2011, which the forbearance agreement itself demonstrates was extended well earlier in 2008. And I lost focus when I was writing the brief and put that last sentence in erroneously. So we have, with the exception of footnote 8, removed that from the argument. But I wanted the record to be clear. If the court is interested, I'd like to address the amendment argument. First off, although it is clear that... That's the letter, right? Yes. It's clear that Judge Hollander says that she is not considering the merits of the amendment argument. However, I would point out that she does spend a considerable amount of time in her opinion discussing the assertions of that argument and the factual support for that argument. Have you ever had another case before Judge Hollander? I have not. He's an extremely thorough person. We take the position, Your Honor, that even if Judge Hollander did not consider the amendment argument, this court can make a definitive ruling on it because the facts giving rise to whether an amendment occurred are undisputed for the purposes of being here today. And they consist solely of the letter from Mr. Robbins, which itself says is nothing more than a confirmation or an affirmation. He is affirming the terms of Section 9b and confirming them and in fact he specifically references 9b. This is not a change obviously. It is nothing. He says it's first out, right? Well, he says it's first out, but then he says this condition is contained in the participation agreement, which of course it is not. Well, but what the better way to look at that, I think, is that it construes the original agreement so if we find an ambiguity in the original agreement, this is really the only evidence we have, parole evidence we have, that says what it means, doesn't it? That's correct, Your Honor. If you can somehow construe 9b to mean what MFB says it does and when you... The word first is ambiguous. I don't think the word first is ambiguous. It may be perfilous, but it's not ambiguous. It means first in time. It's not capitalized. We understand your position. What we're saying is if we find the contract, we understand you don't think it is, but if we find it's ambiguous, then would you acknowledge that we look to this to determine what it means? I guess you would look to that, Your Honor, to determine an ambiguity. You would have to. I thought you made the argument that we don't know where this came from. Well, we don't. I mean, it's undated. It's undated. It's undated. It also was written three years after the fact and under the Maryland Rules of Contract Construction. The inquiry is what a reasonable person in the position of the parties would have thought it meant in 2008 when the participation agreement was entered. So, what Mr. Robbins, who didn't sign the participation agreement, there's no record evidence anywhere that he played any role in negotiating it, what he thinks it means is probably not relevant. In addition, Mr. Hines, who submitted the affidavit from MFB explaining his understanding of the circumstances surrounding this, he also, although he worked for MFB, we have no record evidence anywhere that he played any role in negotiating the participation agreement or that he signed the agreement. Well, plus it refers to the loan number refers to, according to JA 112, refers to the $150,000 loan. Correct. Correct. All of the other provisions, to the extent that I can, and the Court should look to all of the other provisions of the agreement when determining whether there's an ambiguity, and the Court in questioning MFB's counsel pointed out that under Section 1, there's a repayment provision that requires a pro rata distribution. Under Section 3, there's a provision that says all parties shall be of equal priority in the loan. There's Section 7, which requires payments to be made under a pro rata basis. Then there's Section 15 of the agreement. The Court will bear with me one moment. Section 15 deals with collections and provides under 15 D, all collections received by OB in connection with the loan shall be applied as between OB and MFB first to reasonable out-of-pocket expenses, second, ratably, which is just another way of saying pro rata, between OB and MFB to interest earned on the loan, and third, ratably to the unpaid principal balances of MFB's interest. Your Honors, I have 25 seconds left. I would also argue that the construction offered by MFB is prohibited by the terms of the language of the in numerous places which are cited in my brief that this document cannot be construed as a loan or a guarantee by the originating lender to MFB or a loan by MFB to the originating lender. I have one question that I can't find it in my notes, but you talked at one point about lack of capitalization. I can't remember what you talked about. I'm trying to remember what the point was. Perhaps, Your Honor, are you thinking where MFB suggested that they negotiated for this extra protection? Right. Because that's disputed by the language of the agreement itself. There are representations and warranties in the agreement which specifically set forth that at the time the participants agreement was entered, the loan was performing, there were no defaults, and the $3 million loan, the collateral securing it had an as-improved value of $4 million. It's not commercially reasonable to expect that the originating lender would have provided some benefit to MFB in the event of foreclosure without additional compensation or some payment to get that protection. Thank you, Your Honor. Your Honor, I just have a few points to make in response to counsel's argument this morning. One of the things she said, and I thought was important, and I picked up on it, and I hope you all did too. She said the first, the word first is unnecessary or superfluous. That itself is a violation of a principle of contract construction under Maryland law or virtually any law in the state. You are not to ignore language of an agreement. No part of an agreement is supposed to be deemed superfluous or unnecessary. That interpretation, in my view itself, if you're going to omit it, is a violation of how we should construe contracts. Is this a form contract? I think it's a form the parties had used between each other previously. I'm not sure it's a form contract that one or the other party only used. I understand this to be a form that these parties had used before amongst themselves. Are they still negotiating deals together? Bank of Eastern Shore was taken over by the FDIC receiver, and that's how Commerce ultimately acquired this loan. It was sold in the open market by the FDIC. Prior party. Bank of Eastern Shore. I also don't believe the term percentage interest is defined. While we kind of dance around in paragraph one, the citation that counsel cited to in midway through where it says, MFB's interest in the loan expressed as a percentage interest is 25%, then when the term is defined, it's not defined as percentage interest, it's defined as the participant's share. So the term percentage interest isn't defined in that paragraph one of the agreement when we look at it. I just think that adds a layer of ambiguity in my view in paragraph 9C, because now we're using an entirely different term. When did this letter surface? Uh, what do you mean by that, Your Honor? Well, it's not dated. When did the other side know about it? When did you know about it? Well, as I understand it, and as set forth in the affidavit by Mr. Hines, in 2011 there was either a modification or something going on. They requested that MFB provide that, and then Mr. Hines says it came along with an October 26 email from Mr. Markey that's also in the record of JA-127 and 128. So that's how my client had it in his file. Mr. Hines had it in his file that he got this email along with this letter from Bank of the Eastern Shore. Were there any depositions taken here? No, Your Honor. Really, no discovery was undertaken because I think both parties were entrenched in their positions that this agreement was clear and unambiguous and there was no discovery taken. We filed our motions relatively early. I think the case was filed in March of 2014, and we went right to cross motions for summary judgment in April. Was the $150,000 loan collateralized with the same property? I don't believe it was, and I don't believe... Was it paid back? Your Honor? Was it paid back? I don't believe so. I think it was still an outstanding obligation when Commerce got that loan, but we weren't a... as I understand it and maybe counsel can... we were not a participant in that loan. Right. The only participation interest agreement that we're dealing with is the one that's in the record here at JA-11, starting at JA-11. Also, I think of importance is when we look at paragraph 2 of this agreement, it calls out there are special remedies here. It says the parties acknowledge and it's about... 1, 2, 3, 4, 5, 6 line down midway through. It says the parties acknowledge and understand that this is where a default by borrower set forth in section 9 of this agreement. So, in my view, it calls out a specific... it's telling everybody, hey, this might be a little different when you go to paragraph 9b, and 9b controls what happens in the event of a foreclosure and how those proceeds are going to be divided. I also think this is... counsel made an argument that this is essentially... it's not a loan. It's just an agreement as to how we're going to divide up the proceeds in the event it has to go to a foreclosure sale. And at a minimum, Your Honors, I think the case should get remanded. If you agree that this is ambiguous and there are more than one reasonable interpretation, I certainly believe Maryland Financial Bank's interpretation is reasonable. And I think you remand it back to the District Court. We take evidence of all these, extrinsic evidence, and everybody else who was involved in this loan, and then we see what the evidence shows. I'm confident it's going to show exactly what's in that affidavit. That's what the parties intended. That MFB was going to have a first payment in the event of a foreclosure for the collateral. Only in that circumstance would they have some type of priority interest. I see I'm out of time, and I thank you for your attention this morning. How can MFB breach this agreement? That's an interesting question, Your Honor. You raise an interesting point. Well, you just mentioned paragraph 11. Because I suppose it could breach it by not advancing funds. That's one method. In other words, if somebody says, you didn't advance my funds. But this agreement wasn't one where you would have a continuing obligation to put money in. That could be a circumstance. But this one, they paid it all at once. Thank you. Thank you very much. We'll ask our clerk to adjourn court, and then we'll come down and greet the Court. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this country.
judges: Diana Gribbon Motz, Henry F. Floyd, John A. Gibney, Jr..